LESLIE SELIGMAN, Plaintiff-Appellee and Cross-Appellant, v. FIRST NATIONAL INVESTMENTS, INC., *et al.,* Defendants-Appellants and Cross-Appellees.

First District (3rd Division)   No. 1—88—2703

Opinion filed June 21, 1989.

1054

Paul W. Grauer, of Schaumburg (Jane Miller Brennan, of counsel), for appellants.

Vojta & Laguttuta, P.C., of Schaumburg (John C. Vojta, of counsel), for appellee.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Leslie Seligman, filed a second-amended complaint, consisting of 13 counts, against defendants, Amr A. Effat, Shashikant S. Patel, real estate brokers, and First National Investments, Inc. (FNI), their real estate agency. In the first two counts, plaintiff alleged defendants' breach of a contract to sell him certain real estate in Palatine, Illinois. In the remaining 11 counts, plaintiff alleged defendants' common law fraud and violation of the Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) in that transaction. After a bench trial, the trial court entered judgment for plaintiff, in the amount of $5,000, against Patel and FNI on counts I and II. The trial court also dismissed counts III through XIII with prejudice. Lastly, the trial court dismissed defendants' counterclaim with prejudice. Patel and FNI appeal the judgment against them and plaintiff cross-appeals the dismissal of counts III through XIII of his second-amended complaint.

On August 18, 1986, plaintiff was shown the property at 1165 Tern in Palatine, Illinois, by Beverly Schuler, an agent for FNI. Thereafter, plaintiff and Schuler returned to the FNI offices. Before leaving for another appointment, Schuler introduced plaintiff to Effat. According to plaintiff, when he told Effat that he was willing to offer $150,000 on the Tern property, Effat informed him that he would have to offer $165,000 because there was a prior offer on the property. Effat admitted that plaintiff might first have offered $150,000 on the Tern property but claimed that plaintiff wrote $165,000 as the purchase price in the contract. Plaintiff also testified that Effat, who knew plaintiff wanted to resell the property after repairing it, informed him that the property could sell for $225,000 if repaired. Effat claimed he told plaintiff the property could sell at an unspecified higher price if repaired. Effat also admitted that Patel, his partner, had made an offer to purchase the Tern property from Deborah Macaluso on August 16, 1986, that the offer was outstanding on August 18, and that it was accepted on August 22.

As a result of their conversation, Effat prepared a form real estate contract containing plaintiff's offer of $165,000. The contract provided for an earnest money deposit of $5,000 and a closing date of September 15. In the space providing "BROKERAGE FEE: Seller shall pay a brokerage fee as agreed in the listing agreement to," "As agreed to [FNI]" had been printed. Under the "TITLE" clause, the contract provided: "Title, when conveyed, shall be good and merchantable." Under "GENERAL CONDITIONS" on the back of the contract, the "EVIDENCE OF TITLE" clause provided:

"Seller shall deliver or cause to be delivered to Purchaser or Purchaser's attorney not less than five days prior to the time of closing as evidence of title in Seller or Grantor, one of the following:

(a) Owner's Duplicate Certificate of Title *** or certified copy thereof ***.

(b) A title insurance policy or commitment for title insurance ***.
***

Every certificate of title, title insurance policy or commitment for title insurance furnished by Seller shall be conclusive evidence of good and merchantable title as therein shown ***."

Notwithstanding the representation in the contract regarding the brokerage fee, Effat admitted that FNI did not have any listing agreement with Macaluso. Effat also admitted that the contract did not reflect that Patel was attempting to purchase the Tern property

on August 18 and that he did not otherwise inform plaintiff of that fact. Plaintiff paid the $5,000 in earnest money within a few days of August 16.

Patel accepted plaintiff's offer by signing the contract on August 23. A few weeks after plaintiff signed the contract, he testified, Schuler told him that Effat's statement as to the value of the Tern property after repairs was too high because he had compared the property to property in a subdivision with homes of higher value than the Tern property. Plaintiff learned that Patel did not hold title to the Tern property when he received a commitment for a title insurance policy from the Chicago Title Insurance Company. He received the title insurance policy about three months after he signed the contract. The parties stipulated at trial that Patel never had any interest in the property.

After hearing all the evidence, the trial court found that: (1) Patel "failed to show good and merchantable title as per the terms of the contract"; (2) plaintiff did not sustain his burden of proof regarding counts III through XIII; and (3) Patel and FNI did not sustain their burden of proof regarding their counterclaim. The trial court entered judgment accordingly.

Opinion

On appeal, Patel and FNI contend that the trial court erred in finding that Patel breached the contract with plaintiff in that he did not show good and merchantable title to the Tern property. The fact that a vendor does not hold title to real estate at the time he enters a contract to convey it, they assert, does not constitute a breach of contract. Citing *Leaf v. Barton* (1980), 91 Ill. App. 3d 373, 414 N.E.2d 909, defendants argue that, to meet his obligation under a contract, a vendor need only be in a position to tender title to the vendee at the time specified in the contract. Patel and FNI conclude that it was never required that Patel hold title to the property since the time specified for tender of title never arrived, because plaintiff failed to tender the purchase price.

We begin our analysis with the definition of a merchantable title. It is a title not subject to such reasonable doubt as would create a just apprehension of its validity in the mind of a reasonable, prudent and intelligent person, one which such persons, guided by competent legal advice, would be willing to take and for which they would be willing to pay fair value. (*Sinks v. Karleskint* (1985), 130 Ill. App. 3d 527, 474 N.E.2d 767.) However, this definition is merely a starting point. The determination of merchantability also depends to a great

extent on construction of any contract provisions relating, either explicitly or implicitly, to that issue.

██ Under the contract at issue, plaintiff agreed that the seller would deliver "or cause to be delivered" to plaintiff evidence of title in the seller or "[g]rantor." Moreover, the evidence of title in the seller or the grantor, which plaintiff agreed to accept, included a commitment for title insurance. In addition, plaintiff agreed that such evidence would be conclusive evidence of the title reflected therein. Lastly, under the "EVIDENCE OF TITLE" clause of the contract's general conditions, the seller was required, if requested, to execute a "customary form of affidavit of title."

These contract provisions significantly affected what was to be regarded as "good and merchantable title" under the contract. Plaintiff agreed to accept, as evidence of such title, a title commitment reflecting title in Patel *or* his grantor. Having done so, he could not allege a breach of contract on the basis merely that the title commitment did not reflect title in Patel. Even if plaintiff was concerned that Patel would not hold title at the time of conveyance, we believe that he was required to proceed to a closing in order to establish his breach of the contract by failure to tender a merchantable title. We so hold inasmuch as Patel was not required to convey a merchantable title until the closing under the contract. Moreover, if, at that time, plaintiff suspected that Patel's title was not merchantable, he could have required him to execute an affidavit of title as well as the warranty deed by which the conveyance was to be accomplished, as provided in the paragraph relating to the closing date. The provision for such an affidavit also affected what was to be regarded as a good and merchantable title by the parties.

Supportive of our construction of the contract here is *Heller v. McGuin* (1914), 261 Ill. 588, 104 N.E. 158. Therein, in contracting to convey property, of which he was possessed without having the record title, the plaintiff agreed to convey a good merchantable title by warranty deed. When the vendee refused to perform under the contract, the vendor sued for specific performance. The vendee defended his failure to perform on the grounds, *inter alia*, that, as the vendor was not the owner of the record title when the contract was made, he could not, by acquiring title later, enforce the contract against the vendee. In rejecting this argument the court stated:

> "The contract was essentially one of a party obligating himself, within a certain time, to sell property he did not own at the time he made the contract, but the fact that at the time it was made [vendor] was not in a position to perform *** is not con-

clusive that it was not capable of enforcement when he did, within the time fixed, become able to perform." *Heller*, 261 Ill. 2d at 592.

While *Heller* was a case of specific performance, the rationale of the court clearly reveals that, contrary to plaintiff's position, Patel was not in breach of the contract merely because the evidence of title revealed that he was not the record owner of the Tern property.

Moreover, in contrast to the contract here is the contract in *Geithman v. Eichler* (1914), 265 Ill. 579, 107 N.E. 180. In *Geithman*, Alfred and May Eichler had contracted to sell real estate by a contract providing, *inter alia*, that title was to be shown in Alfred Eichler by October 15, 1912, and that the grantors would deliver a good and merchantable abstract of title on March 1, 1913. On the eventual closing date, the vendees claimed that the title which the vendors intended to convey did not comply with the contract. On appeal, the vendors contended that the contract bound them to convey fee simple title to the land by warranty deed but not to furnish an abstract showing such title in them of record, or as the court otherwise stated, an abstract showing merchantable title in them. In deciding the issue, the court stated:

> "As we construe the agreement, [vendors] were bound not only to convey to [vendees], by warranty deed, a good title free from encumbrances, but they were required to show by October 15, 1912, that they owned such title, and by March 1, 1913 *** they were to furnish [vendees] an abstract showing merchantable title in them. *** [Vendors'] agreement required them to convey to [vendees] a good and merchantable title, and it seems clear to us the intention of the parties was, from the language used, that the abstract should show they owned and were able to convey the kind of a title they had agreed to convey to [vendees]." *Geithman*, 265 Ill. at 583-84.

Unlike the contract in *Geithman*, the contract in this case cannot reasonably be construed as requiring that the evidence of title, supplied the vendee pursuant to the contract, show merchantable title in one person and only one person: the seller.

Additionally, *Christopher v. West* (1952), 345 Ill. App. 515, 104 N.E.2d 309, which plaintiff cites in support of the proposition that ownership of property is a requirement to show merchantable title, actually supports the conclusion that the evidence of title supplied under the contract is not necessarily conclusive of whether a merchantable title may be subsequently shown. *Christopher* states that " '[a] merchantable title is not necessarily a perfect record of title, without

fault, defect or omission, but whenever an abstract, *together with explanatory affidavits*, shows a person to have an indefeasible title in fee simple, whether acquired by deed, devise or by virtue of the Statute of Limitations, then such abstract shows a merchantable title.' " (Emphasis added.) *Christopher*, 345 Ill. App. at 530-31, quoting *Bedinger v. May* (1926), 323 Ill. 187, 191.

*Christopher* thus recognizes the validity of supplementing the evidence of title provided, under a contract to convey, with an affidavit of title to show that the person conveying the property has merchantable title to it at the time of conveyance. In citing *Christopher*, plaintiff ignores that it allows such title to be shown through the documentary evidence of title *and* any "explanatory affidavits."

*Crum v. Krol* (1981), 99 Ill. App. 3d 651, 425 N.E.2d 1081, and *Madigan v. Buehr* (1970), 125 Ill. App. 2d 8, 260 N.E.2d 431, which plaintiff cites in support of his contention that defendants breached the terms of the contract at issue here, are of no avail to plaintiff.

In *Crum*, the defendant vendor was unable to fulfill his contractual duty to convey property by virtue of his failure to obtain the signatures of the other owners of the property on the contract at the time of closing. The appellate court relied on the rules that the grantor of real estate need not have title to property at the time the contract is made and that it is the promise to convey title that is the basis of the contract. The appellate court held that the contract was nonetheless enforceable against the defendant and that he breached it. In contrast to the situation in *Crum*, defendants do not concede, nor does the record reveal, that Patel would have been unable to convey title to plaintiff when the time to do so under the contract arrived.

Admittedly, as the parties stipulated at trial, Patel never had title to the Tern property. However, as plaintiff apparently chose to consider the contract breached upon receiving the title commitment rather than to proceed to the closing of the contract, we cannot say, unlike the situation in *Crum*, that Patel breached his contractual duty to convey a good and merchantable title at that time. As plaintiff did not continue his performance by requiring Patel to close the contract, Patel was not required to obtain title to the Tern property in order to satisfy his contractual obligations.

In *Madigan*, a land trust beneficiary contracted to convey the trust *res*, as its owner, and sought damages for the vendees' breach of the contract. The court held that a land trust beneficiary could contract to sell the trust *res* only by exercising her power of direction over the trust either explicitly or by disclosing the trust and her sta-

tus as beneficiary. *Madigan* turned on the attributes of the Illinois land trust and the relationship of the beneficiary and trustee thereunder to the trust *res* and is thus totally inapposite to this case. There is no support whatever in *Madigan* for the proposition for which plaintiff cites it, *i.e.*, that unless a vendor, under a contract to convey real estate, discloses at the time of contracting that he is not the title holder he will be in breach of the contract.

Neither do the remaining cases cited by plaintiff compel the conclusion that Patel breached the contract merely because the title commitment did not show merchantable title in him.

Lastly, plaintiff attempts to avoid the rule stated in *Leaf* on the ground that Patel could meet his obligation to tender title to the Tern property only by defendants' use of plaintiff's funds, which, he asserts, required his consent. This "apples and oranges" argument is unavailing to plaintiff. That defendants used plaintiff's earnest money as the earnest money on Patel's contract with Macaluso, while perhaps giving plaintiff a cause of action for conversion, does not make the rule stated in *Leaf* inapplicable here. A wrongful conversion by defendants of plaintiff's earnest money was totally unrelated to whether Patel breached the contract with him by failing to show a merchantable title as required under the contract.

■ In summary, the evidence merely showing that Patel did not hold title to the Tern property, when the title commitment was delivered to plaintiff, did not prove that Patel did not hold, and thus could not convey, a good and merchantable title when he was required to do so under the contract, *i.e.*, at the time of closing. The trial court's judgment for plaintiff on counts I and II of the second-amended complaint was thus against the manifest weight of the evidence. In view of this conclusion, we need not consider whether, as defendants next contend, the trial court erred in entering judgment against FNI because it was not a party to the contract with plaintiff.

Plaintiff cross-appeals the trial court's dismissal, after trial, of counts III, IV, VII, VIII, X, and XIII of his second-amended complaint. The trial court dismissed all but counts I and II of the second-amended complaint after finding that plaintiff had not sustained his burden of proof thereon. Therefore, the applicable standard is whether what amount to verdicts for defendants on these counts were against the manifest weight of the evidence.

Plaintiff contends that the trial court erred in dismissing counts III, IV and X, which alleged causes of action for common law fraud against each defendant based on their alleged misrepresentations that Patel owned the Tern property.

■ To prove a claim of common law fraud, a plaintiff must show (1) a false statement of material fact; (2) known or believed by the maker to be false; (3) made for the purpose of inducing reliance thereon; (4) justifiable and actual reliance thereon; and (5) injury. See, e.g., *Seefeldt v. Millikin National Bank* (1987), 154 Ill. App. 3d 715, 506 N.E.2d 1052.

After reviewing the record, we cannot conclude that the trial court's verdicts for defendants on counts III, IV, and X were against the manifest weight of the evidence.

Count III alleged that Patel falsely signed the real estate contract as the owner of the Tern property. While plaintiff's offer to purchase the Tern property was addressed to "Owner of Record," it was Effat who wrote that term on the contract. Moreover, immediately after the space in which this term was handprinted, "(Seller)" was preprinted on the form. Thereafter, the form contract referred only to "Seller" in all of its substantive provisions, including the lines provided for acceptance of the offer to purchase, on which Patel's signature appears.

In addition, appended to the form contract was an attorney's approval rider. On this rider, "Seller is Licensed Real Estate Broker in Ill.," was printed below Patel's signature. Plaintiff denied that the rider contained that notation when he signed it on August 18. However, it is undisputed that Patel did not sign the contract until five days after plaintiff signed. Thus, the notation on the rider tended to disprove the allegation that Patel signed as the owner of the Tern property, whether or not the notation was there when plaintiff signed it. Under all the evidence on the issue, we cannot say that the manifest weight of the evidence reveals that, in accepting plaintiff's offer to purchase by signing a contract referring in all but one place to the "Seller," Patel represented himself to be the owner of the Tern property.

Count IV alleged that an unnamed agent of FNI with whom plaintiff met on August 18 told him that Patel owned the Tern property. Because count X alleged that Effat misrepresented that Patel owned the Tern property, the only agent of FNI to whom count IV could have referred was Beverly Schuler. However, neither plaintiff nor Schuler testified that she told plaintiff that Patel owned the Tern property. As such, there was absolutely no proof of the most material allegation of count IV. Manifestly, the trial court's verdict for FNI on count IV was not against the manifest weight of the evidence.

The evidence was conflicting with respect to the allegation in count X that Effat told plaintiff that Patel owned the Tern property. While plaintiff claimed at trial that Effat did tell him that Patel

owned the Tern property, Effat denied making the statement. Therefore, we cannot say that the trial court's verdict for Effat on count X was against the manifest weight of the evidence.

Plaintiff also contends the trial court erred in dismissing counts VII, VIII, and XIII of his second-amended complaint.

Counts VII, VIII and XIII alleged that defendants violated the Consumer Fraud Act in that they: (1) misrepresented the value of the Tern property both before and after any repairs by plaintiff; and (2) failed to disclose to plaintiff that Patel: (a) was a real estate broker associated with FNI; (b) did not own the Tern property; and (c) was attempting to purchase it at a lower price than plaintiff offered. Plaintiff alleged in these counts that he was damaged in that he had not received his earnest money, lost profits as to a successful transaction and sustained less than $15,000 in other consequential damages. He prayed for judgment in that amount plus costs, punitive damages and attorney fees.

■■ ■ Section 2 of the Consumer Fraud Act outlaws, *inter alia,* unfair or deceptive acts or practices including the misrepresentation, concealment or omission of any material fact with the intent that others rely on such misrepresentation, concealment or omission in the conduct of any trade or commerce whether or not any person is in fact misled, deceived or damaged thereby. (Ill. Rev. Stat. 1985, ch. 121½, par. 262.) Section 2 applies to misrepresentations by real estate brokers to prospective purchasers. (*Beard v. Gress* (1980), 90 Ill. App. 3d 622, 413 N.E.2d 448.) Moreover, a plaintiff suing under the Consumer Fraud Act need not establish all of the elements of common law fraud. *Duhl v. Nash Realty, Inc.* (1981), 102 Ill. App. 3d 483, 495, 429 N.E.2d 1267.

■ With regard to defendants' alleged misrepresentations of the value of the Tern property, there was absolutely no evidence of any statements by defendants of the value of the Tern property *before* any repairs. Moreover, as to the only alleged statement of any defendant as to the value of the property after repairs, plaintiff did not prove the *sine qua non* of a claimed misrepresentation actionable under the Consumer Fraud Act, *viz.,* that it was, in fact, false. That is, even conceding, as proven facts, that Effat represented to plaintiff that the Tern property would be worth $225,000 after repairs and that he improperly based this representation on a comparison with properties of higher values, plaintiff introduced absolutely no evidence of the true value of the property after repairs. It was incumbent upon plaintiff to do so in order to meet his burden of proving that Effat's representation was a *misrepresentation.* As such, we cannot reverse the trial

court's verdicts on counts VII, VIII and XIII, in this regard, as against the manifest weight of the evidence.

However, the manifest weight of the evidence does reveal, as plaintiff next alleged in these counts, that defendants failed to disclose that Patel was: (1) a real estate broker associated with FNI; (2) not the owner of the Tern property; and (3) attempting to purchase it at a lower price than plaintiff offered.

██ There can be no doubt, on the record before us, that all defendants knew, at the time plaintiff signed the contract at issue, that Patel was: (1) associated with FNI; (2) not the owner of the Tern property, although he shortly thereafter represented himself to plaintiff as the seller of the property; and (3) attempting to purchase it from Deborah Macaluso. Neither can it be disputed on the record that no defendant disclosed these facts to plaintiff before Patel accepted his offer to purchase the Tern property as the seller. Further, defendants do not dispute that nondisclosures of such facts by real estate brokers constitute violations of the Consumer Fraud Act. Nor could they seriously do so.

██ Real estate brokers occupy a position of trust with respect to the purchasers with whom they negotiate. They owe a corresponding duty to exercise good faith and to disclose any personal interest in property they list for sale. (*Sawyer Realty Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, 386, 432 N.E.2d 849.) This, Effat admitted, he did not do. *Sawyer Realty Group* held that the failure of real estate brokers to disclose such self-dealing to a prospective purchaser of property gave rise to a private right of action for violation of the Real Estate Brokers and Salesmen License Act (Ill. Rev. Stat. 1977, ch. 111, par. 5701 *et seq.*). Logically, it also constitutes consumer fraud. The trial court's findings for defendants on counts VII, VIII and XIII were against the manifest weight of the evidence with respect to these three latter allegations.

For all of the foregoing reasons, we: (1) affirm the trial court's judgment for defendants on counts III, IV and X of plaintiff's second-amended complaint; (2) reverse the judgment for plaintiff on counts I and II of the second amended complaint; (3) reverse the judgment for defendants on counts VII, VIII and XIII of the second-amended complaint; and (4) remand the cause for a new trial on counts VII, VIII and XIII.

Affirmed in part; reversed in part and remanded.

WHITE and CERDA, JJ., concur.