NO. 4-97-0667 

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

JO ANN KIRKRUFF and JAMES L. ARMSTRONG, ) Appeal from

as Trustees of the HELEN B. ARMSTRONG ) Circuit Court of

FAMILY TRUST, ) Champaign County

Plaintiffs-Appellees and ) No. 94L1843

Cross-Appellants, )

v. ) 

TAD WISEGARVER, d/b/a TAD WISEGARVER )

REAL ESTATE, ) Honorable

Defendant-Appellant and ) Arnold F. Blockman,

Cross-Appellee. ) Judge Presiding.

_________________________________________________________________

JUSTICE STEIGMANN delivered the opinion of the court:

In December 1994, plaintiffs, Jo Ann Kirkruff and James L. Armstrong, as trustees of the Helen B. Armstrong Family Trust (the Trust), filed suit against defendant, Tad Wisegarver, alleg­ing, 
inter
 
alia
, that Wisegarver breached his fidu­cia­ry duty (count I) and viola­ted the Consumer Fraud and Deceptive Business Practices Act (Act) (815 ILCS 505/1 
et
 
seq
. (West 1994)) (count III) in his capacity as their real estate broker.  (The trial court later granted plain­tiffs' motion to voluntarily dismiss the remain­ing three counts.)  In Febru­ary 1997, the trial court contem­po­ra­ne­ous­ly con­duct­ed a jury trial as to count I and a bench trial as to count III.  A jury subsequent­ly re­turned a verdict in plaintiffs' favor on count I and awarded $58,200 in damag­es.  In June 1997, the trial court found as a matter of law that damages totalled $90,324.74 (Wisegarver's stipulated net profits) and entered judg­ment in that amount on count I.  The court also entered judgment in Wisegarver's favor on count III.

Wisegarver appeals, arguing that the trial court erred by (1) denying his motions for directed verdict and judgment 
n.o.v.
 because the evidence failed to show that (a) a fiduciary rela­tion­ship existed, (b) Wisegarver breached his fidu­ciary duty, or (c) Wisegarver's breach of fiduciary duty proximately caused plaintiff's injury; and (2) entering judgment in plaintiffs' favor on count I in an amount exceed­ing the jury's award.  Plaintiffs cross-appeal, arguing that the court's finding that Wisegarver did not violate the Act was against the manifest weight of the evidence.  We affirm in part, reverse in part, and remand for further proceedings.  

I.  BACKGROUND

The material in this section is not to be published pursuant to Supreme Court Rule 23.  166 Ill. 2d R. 23.

Nonpublishable material under Supreme Court Rul23 omitted.

II.  ANALYSIS

A.  The Trial Court's Denial of Wisegarver's Motions

for Directed Verdict and Judgment 
N.O.V.

Wisegarver first argues that the trial court erred by denying his motions for directed verdict and judgment 
n.o.v.
 because the evidence did not show that (1) a fiduciary relation­ship existed between Wisegarver and plaintiffs; (2) Wisegarver breached his fidu­ciary duty; or (3) Wisegarver's breach of his fiduciary duty proxi­mately caused plaintiffs' injury.  We dis­agree.

1.  
Standard of Review

A trial court should not grant a motion for directed verdict or judgment 
n.o.v.
 unless "all of the evidence, when viewed in its aspect most favorable to the opponent, so over­whelm­ing­ly favors movant that no con­trary verdict based on that evidence could ever stand."  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967); see 
Thacker v. U N R Indus­tries, Inc.
, 151 Ill. 2d 343, 353, 603 N.E.2d 449, 454 (1992).  

2.  
Existence of a Fiduciary Relationship

Specifically, Wisegarver contends that the evidence did not show that a fiduciary relationship existed and, instead, the acts of the parties constituted nothing more than the sharing of informa­tion to develop the terms of some possible agreement.  We dis­agree.

A contract to employ a real estate broker need not be in writ­ing.  
In re Estate of Vallerius
, 253 Ill. App. 3d 226, 230, 624 N.E.2d 459, 462 (1993).  All that is required is action by the broker and consent by the principal.  Such consent may be oral, written, or implied by the conduct of the parties.  
Letsos v. Century 21-New West Realty
, 285 Ill. App. 3d 1056, 1063, 675 N.E.2d 217, 223 (1996).  Whether an agency relationship exists may be estab­lished by circum­stantial evidence, including the situa­tion of the parties, their acts, and other relevant circum­stanc­es.  The existence of an agency rela­tion­ship constitutes a question of fact for the trier of fact.  
Matthews Roofing Co. v. Community Bank & Trust Co.
, 194 Ill. App. 3d 200, 206, 550 N.E.2d 1189, 1193 (1990).  A plaintiff must prove the existence of an agency relationship by clear and con­vinc­ing evi­dence.  See 
State Securi­ty Insurance Co. v. Frank B. Hall & Co.
, 258 Ill. App. 3d 588, 595, 630 N.E.2d 940, 945 (1994).   

A real estate broker serves as an agent of a property owner, and an agency relation­ship engen­ders a type of fiducia­ry affilia­tion in which the principal has the right to control the agent's conduct, and the agent has the power to act on the principal's behalf.  Once an agency relationship is found, a fidu­cia­ry rela­tion­ship arises as a matter of law.  
Letsos
, 285 Ill. App. 3d at 1064, 675 N.E.2d at 223-24. 

Initially, we note that Wisegarver correctly points out that the supreme court in 
Martin v. Heinold Commodities, Inc.
, 163 Ill. 2d 33, 44-45, 643 N.E.2d 734, 740 (1994) (
Martin
 II
), quoting 
Martin v. Heinold Commodities, Inc.
, 117 Ill. 2d 67, 78, 510 N.E.2d 840, 844-45 (1987) (
Martin
 I
), quoting Restate­ment (Sec­ond) of Agency §389, comment 
b
 (1958), adopted the 
general
 rule that "an `agent is subject to no fiduciary duty in making the agree­ment by which he becomes [an] agent.'"  Howev­er, he fails to point out that the supreme court also adopted the follow­ing excep­tion to the general rule:

"`[W]e are unwilling to conclude, as a matter of law, that a fiduciary duty can never be imposed upon a prospective agent prior to the formal creation of an agency relationship.  Thus, while the general rule governing preagency [contacts] does not require disclo­sure of the terms of a prospec­tive agent's compensation, we believe that facts could be established which would support imposition of a fiduciary duty upon a prospective agent applicable to preagency [contacts].'"  
Mar­tin
 
II
, 163 Ill. 2d at 45, 643 N.E.2d at 740, quot­ing 
Martin
 I
, 117 Ill. 2d at 78-79, 510 N.E.2d at 845, citing Restate­ment (Sec­ond) of Agency §390, Comment 
e
 (1958).

The court also noted that "[a]ll that is required is that the creation of the agency relationship involve peculiar trust and confidence, with reliance by the principal on the fair dealing by the agent."  (Emphasis omitted.)  
Martin
 II
, 163 Ill. 2d at 47, 643 N.E.2d at 741.

The evidence here showed that Kirkruff respond­ed to Wisegarver's advertisement in which he held himself out as a special­ist in "land development" and "subdivision marketing and sales."  Kirkruff testified that she initially contacted Wisegarver to be her agent in developing the property.  Wisegarver testified that he holds himself out as a specialist in the marketing and sales of development land, and during his first conversation with Kirkruff, she told him she was inter­ested in Wisegarver marketing the property and determin­ing whether it could be developed.  Kaisner opined that a fiduciary relationship existed between Wisegarver and Kirkruff when Kirkruff initially contacted Wisegarver to seek his advice and opinion regard­ing the property. 

Kirkruff also testified that between the time Wisegarver told her it was not economically feasible to develop the land and the date she entered into the agreement to sell the land to him, she asked him to sell the property for her based upon his represen­tations, and they agreed upon a commission of "[a]round 6 percent."  Further, Wisegarver effectively conced­ed that he was Kirkruff's agent when he testified that he thought the property could have sold for $2,500 per acre, "but 
in
 
the
 
situation
 
between
 [
him
 
and
 
Kirkruff
], if [he] were to market the property, [
he
] 
would
 
charge
 
a
 
commission
 which basically off of that would be the same net to [Kirkruff]."  (Emphasis added.)  See 
Letsos
, 285 Ill. App. 3d at 1068, 675 N.E.2d at 226 (real estate broker effective­ly conceded that he was still property owner's broker by having pursued his broker's commissions after having entered into the con­tract of sale between himself and the owner).  Kirkruff stated that during the period from January 1993 through April 30, 1993 (when the parties closed the sale), she trusted Wisegarver and believed he was working for her as her real estate agent.  Moreover, Kaisner opined that even after Wisegarver in­formed Kirkruff of his interest in purchasing the property, his fiducia­ry duty to Kirkruff continued.  See 
Letsos
, 285 Ill. App. 3d at 1068, 675 N.E.2d at 226-27 (fiducia­ry duty continued after property owner contracted to sell proper­ty to broker). 

Based on our review of the record in this case, we conclude that the evidence supports the jury's verdict under the 
Pedrick
 standard.

3.  
Breach of Fiduciary Duty

Wisegarver also contends that the evidence failed to show that he breached his fiduciary duty.  We disagree.

The fiduciary relationship between a broker and a principal requires full disclosure of all relevant facts relating to the trans­action or affecting the subject matter of the agency.  An agent owes general duties of good faith, loyalty, and trust to his or her princi­pal.  If a broker, as an agent, enters into a con­tract with the princi­pal, the same duties of good faith and disclosure continue.  Where a fiduciary rela­tionship exists at the time of the transaction and the broker appears to benefit, the transac­tion is pre­sumptively fraudulent, which may be rebut­ted by clear and con­vincing evi­dence of good faith, showing that the broker did the following:  (1) fully dis­closed all relevant infor­ma­tion to the principal before entering into the transac­tion; (2) paid adequate consider­ation; and (3) provided competent and indepen­dent advice to the princi­pal.  
Letsos
, 285 Ill. App. 3d at 1066-67, 675 N.E.2d at 225-26.  Further, a broker cannot purchase from a principal unless the principal expressly assents thereto or, with full knowledge of all the facts and circumstanc­es, acquiesces in such a transac­tion.  Even if the principal gives her assent to a purchase by the broker, the broker's actions throughout must be characterized by the utmost good faith.  
Letsos
, 285 Ill. App. 3d at 1068-69, 675 N.E.2d at 227.  

The evidence here showed that (1) al­though Wisegarver found out in early Febru­ary 1993 that the property was not within the city's zoning limits (which meant that it would be subject to less demanding development requirements), he none­the­less told Kirkruff that it would be a "very risky develop­ment"; (2) in early Febru­ary 1993, Wisegarver entered into an agreement with Altech, in which Altech agreed to plat a 20-acre subdivision for a project named "Wisegarver Section 32 Subdivi­sion"; (3) accord­ing to Kirkruff, Wisegarver never in­formed her that he had hired Altech to develop the property as his subdivi­sion; (4) Wisegarver never told Kirkruff that the property's location outside the city's zoning limits was good for develop­ment purpos­es or that he had contacted Altech to determine the property's loca­tion rela­tive to the city; (5) Wisegarver never listed or advertised the property as Kirkruff requested him to do; (6) according to Kirkruff, Wisegarver never showed her the February 12, 1993, letter from Mara­thon indicat­ing that it had completed flagging of the pipe­line on the property; (7) during January through April 1993, Wisegarver never advised Kirkruff that he was at­tempting to develop the property for his own gain and that she should find another realtor to represent her inter­ests; (8) Wisegarver failed to give plain­tiffs written notice that he was acting on his own behalf in the trans­action between them; and (9) Wisegarver failed to disclose to plaintiffs the poten­tial costs and profits of devel­oping and subdividing the property.  

Based on our review of the record in this case, we conclude that the evidence supports the jury's verdict under the 
Pedrick
 standard. 4.  
Proximate Causation

   Wisegarver also contends that the evidence failed to show that his breach of his fiduciary duty proximately caused plaintiffs' injury because plaintiffs presented no competent expert testimony that they could have duplicated Wisegarver's $90,324.74 profit.  We dis­agree.

The supreme court in 
Martin
 II
 held that "plain­tiffs must prove that a defendant's actions proximately caused their inju­ries before they can recover in tort, 
even
 
in
 
instances
 
of
 
intentional
 
torts
 
where
 
fiduciaries
 
are
 
involved
."  (Emphasis added.)  
Martin
 II
, 163 Ill. 2d at 59, 643 N.E.2d at 747.  Plain­tiffs agree that the 
Martin
 II
 court so held; however, they contend that because 
Martin
 II
 involved a securities case, the supreme court's discus­sion of "loss causa­tion" (a term originally used by federal courts in dealing with proximate cause in securi­ties cases) is inap­pli­ca­ble to the present case.  

In 
Martin
 II
, a group of inves­tors sued a securi­ties broker for breach of fidu­ciary duty and fraud.  In determining whether the plaintiffs could recover their full investment losses under the Act, the supreme court held that in securities cases, plain­tiffs must prove both (1) transaction causation (cause in fact), and (2) loss causation (a term analogous to proximate cause).  The court set out the specific question to ask under such circumstances to determine whether a plaintiff has proven loss causation, or proximate cause, as fol­lows:

"'Would the decline in plaintiff's investment have occurred even if defendant's misrepre­senta­tion had been true?  If the answer to this ques­tion is "yes," plaintiff has failed to prove that the misrepresentation proxi­mate­ly caused the decline.'"  
Martin
 II
, 163 Ill. 2d at 62, 643 N.E.2d at 748, quoting W. Prosser, Torts §110, at 732 (4th ed. 1971). 

We agree with plaintiffs that the 
Martin
 II
 court's 
specif­ic
 discussion regarding loss causation in securi­ties cases does not apply to the present case.  In our judgment, however, the 
Martin
 II
 court's general discussion of proxi­mate cause informs our analysis of the proxi­mate cause issue in this case. 

In 
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455, 605 N.E.2d 493, 502 (1992), the supreme court discussed proximate cause, as follows:

"The term 'proximate cause' describes two distinct requirements:  cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsi­bility should be extended for conduct that, in fact, caused the harm."

Prosser has noted that while a misrepresentation may have induced a trans­action, proximate cause limits recovery to "those damages which might foreseeably be expected to follow from the character of the misrepresentation itself."  W. Prosser, Torts §110, at 732 (4th ed. 1971).  In addition, section 548A of the Restatement (Second) of Torts provides, as follows: 

"A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reli­ance."   Restatement (Second) of Torts §548A, at 106 (1977).  

Restatement (Second) of Torts, section 548A, comment 
b
, provides:

"Pecuniary losses that could not reason­ably be expected to result from the misrepre­senta­tion are, in general, not legally caused by it and are beyond the scope of the maker's liability.  This means that the matter mis­represented must be considered in the light of its tendency to cause those losses and the likelihood that they will follow."  Re­state­ment (Second) of Torts §548A, Comment 
b
, at 107 (1977).

Consistent with this authority, we hold that to recover for misrepresentation in cases involving breach of fiduciary duty, plain­tiffs must prove (1) cause in fact--name­ly, that the misrepre­sentation in fact induced the recipi­ent to enter into the transac­tion; and (2) proximate cause--namely, that the charac­ter of the fiduciary's misrep­resenta­tions could reason­ably be expect­ed to result in the recipient's injury.  Therefore, in this case, plaintiffs had to show that the character of Wisegarver's misrep­resentations and omis­sions could reasonably be expect­ed to result in their injury--that is, their missed oppor­tunity to develop the proper­ty.  It follows then that plaintiffs' missed opportuni­ty to develop the property could not reasonably be expected to result from Wisegarver's misrepre­senta­tions and omissions if plaintiffs could not have developed the property regardless of Wisegarver's misrepresenta­tions and omis­sions.  However, we disagree with Wisegarver's assertion that plaintiffs had to show that they could have developed the proper­ty 
on
 
their
 
own
.  If we were to accept such an assertion, a realtor could almost always avoid liability for his misrepresenta­tions or omissions given that few untrained private property owners could develop proper­ty without any assistance whatsoever.  Moreover, we dis­agree with Wisegarver's conten­tion that plain­tiffs had to show that they could have 
dupli­cat­ed
 Wisegarver's prof­its.  That conten­tion goes solely to the measure of damages.

The evidence here showed that (1) Wisegarver told Kirkruff that problems existed with the property--namely, a gas pipeline ran through the property and prob­lems would arise with the annex­ation; (2) Wisegarver told her that developing the proper­ty would be "too costly" and "too time-consuming" for her to do it; (3) even though Wisegarver knew the property was not within the city's zoning limits (which meant that it would be subject to less demanding development requirements), he none­the­less told Kirkruff that it would be a "very risky develop­ment"; (4) he failed to give plaintiffs written notice that he was acting on his own behalf in connection with the develop­ment; (5) he told Kirkruff the property was worth no more than $2,300 per acre; and (6) he failed to tell Kirkruff that he was at­tempt­ing to develop and subdi­vide the land on his own or that she should find another realtor to represent her interests.

Further, the evidence showed that had Kirkruff known that Wisegarver was in the process of developing and subdividing the property on his own, she would not have sold him the property for $46,000.  Instead, she would have contacted another realtor to assist her in developing the property herself, and she "[e]asily" had enough assets to develop the property.  Kaisner, plaintiffs' expert, testi­fied that although she did not know of anyone who would simply hire themselves out to develop property for an out-of-town proper­ty owner, her experience has shown that "most people would be interested in doing it, doing it for himself or with partners or some type of a partner arrangement."  In addi­tion, DiNovo, director of the county's zoning and planning depart­ment, testi­fied that if a property owner has a right to develop property based upon its zoning classification, the Department has a duty to allow the development if the owner complies with the technical requirements.  Finally, perhaps the best evidence of the property's development potential was the fact that Wisegarver actually developed it.

Based on our review of the record in this case, we conclude that the evidence supports the jury's verdict under the 
Pedrick
 standard.

Accordingly, we hold that the trial court did not err by denying Wisegarver's motions for directed verdict or judgment 
n.o.v.
 

B.  The Trial Court's Entry of Judgment on Count I

in Excess of the Jury's Award

Last, Wisegarver argues that the trial court erred by entering judgment on count I in an amount in excess of the jury's award of $58,200.  In response, plaintiffs argue that the court proper­ly ordered an 
additur
 because once the jury found Wisegarver liable on count I, the amount of damages was fixed and liquidat­ed in the amount of $90,324.74.  We agree with plain­tiffs.

In 
J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.
, 118 Ill. 2d 447, 456-57, 516 N.E.2d 260, 264-65 (1987), the supreme court discussed 
additur
, as follows:

"
Additur
, though not available in the Federal courts [citation], has been used in State courts and, indeed, may have first appeared in an Illi­nois case, 
Carr v. Miner
 (1866), 42 Ill. 179 ([cita­tion]).  In 
Carr
, an action in assumpsit, the jury erroneously allowed the plaintiff 6% interest on his award rath­er than 10%, a rate that the defen­dant had pre­viously agreed to pay.  The defendant con­sent­ed to an 
additur
, and the trial judge there­fore denied the plaintiff's motion for a new trial, find­ing no other error in the case.  This court affirmed the trial judge's action:  

`The evidence showed that defendant always recog­nized his liabil­ity to pay ten per cent inter­est, and under the statute he could bind himself for that rate, by agree­ment.  This the jury should have allowed.  ***   It was a case in which the amount could be cal­cu­lated with certainty when the basis was found.  The prac­tice is one that should be sparingly indulged, and should never be adopt­ed except in clear cas­es.'"

Additur
 is unavailable where unliquidated tort damages are at issue.  
Bernesak v. Catholic Bishop
, 87 Ill. App. 3d 681, 691-92, 409 N.E.2d 287, 295 (1980).

In 
Perry v. Engel
, 296 Ill. 549, 554, 130 N.E. 340, 343 (1921), the supreme court discussed the measure of damages in cases involving misrepresentation by a real estate broker and wrote the following:

"An agent 
cannot
 
take
 
any
 
advantage
 
of
 
his
 
posi­tion
 
to
 
speculate
 
to
 
the
 
injury
 
of
 
his
 
principal
, and 
all
 
profits
 
and
 
advantages
 
gained
 
in
 
the
 
transac­tion
 
of
 
the
 
agent
 
belong
 
to
 
the
 
principal
.  The relation of principal and agent is one of trust and confidence, and where such confidence is reposed and such relation exists it must be faithfully acted upon and preserved from any intermixture of imposition.  The rule is the same no matter how large or how small the commission paid may be or whether the agent is a mere volun­teer at a nominal consideration.  [Citations.]  Under the relation of the parties here, [the prin­ci­pals] had a right to all the bene­fits and ad­vantages of the transac­tion ***."  (Em­pha­sis add­ed.)

In 
Perry
, a real estate broker misrepresented information to his clients and profited personally from the purchase and resale of the clients' property.  
Perry
, 296 Ill. at 552, 130 N.E. at 342.  In 
Sams v. Rigg
, 339 Ill. App. 25, 31, 88 N.E.2d 673, 676 (1949), the real estate broker did business secretly with a purchaser who paid more for the property than the broker dis­closed to his principals.  The 
Sams
 court, relying on 
Perry
, held that the principals had a right to the profit the broker made from the secret transaction.  
Sams
, 339 Ill. App. at 31, 88 N.E.2d at 676.  

The rule set forth in 
Perry
 comports with section 549, comment 
i
 of the Restatement (Second) of Torts, which discusses the measure of damages in misrepresentation cases where the recipient of the misrepre­sentation has suffered no out-of-pocket loss.  That section pro­vides as fol­lows:

"When the value of what the plaintiff has received under the transaction with the defen­dant is fully equal to the value of what he has parted with, he has suffered no out-of-pocket loss, and under the rule stated in [s]ubsection (1), [c]lause (a) [providing that the recipient of misrepresenta­tion may choose to recover his actu­al out-of-pocket loss­], he could recover no dam­ages.  This would mean that the defrauding defen­dant has successfully accomplished his fraud and is still immune from an action in deceit.  Even though the plaintiff may rescind the transac­tion and recover the price paid, the defen­dant is 
enabled
 
to
 
speculate
 
on
 
his
 
fraud
 
and
 
still
 
be
 
assured
 
that
 
he
 
can
 
suffer
 
no
 
pecu­niary
 
loss
.  
This
 
is
 
not
 
justice
 
between
 
the
 
parties
.  The admonitory function of the law requires that the defendant not escape lia­bility and justi­fies allowing the plaintiff the benefit of his bar­gain."  (Emphasis add­ed.)  Re­state­ment (Second) of Torts §549, Com­ment 
i
, at 115 (1977).

See also W. Keeton, Prosser & Keeton on Torts §110, at 768 (5th ed. 1984) ("in many cases the out-of-pocket measure will permit the fraudulent defendant to escape all liability and have a chance to profit by the transaction if he can get away with it").   

Based upon the foregoing authority, we con­clude that once the jury found Wisegarver liable, the amount of damages was fixed at the amount of Wisegarver's net profit on the subdivi­sion.  In so concluding, we note that Wisegarver contends that the net profit includ­ed his personal services as developer, organiz­er, monitor, construc­tion manager, and sales broker, and that those personal services arguably to­talled $90,000, thereby leaving him with no profit.  However, Wisegarver himself prepared the account ledger which indicated his net profit totalled $90,324.74, and had he so desired, he could have reflected the costs of his personal services on that ledger or testified as to the costs of his services.     

C.  The Trial Court's Determination That Wisegarver

Did Not Violate the Act

On cross-appeal, plaintiffs argue that the trial court's determination that Wisegarver did not violate the Act (815 ILCS 505/2 (West 1992)) was against the manifest weight of the evi­dence.  Al­though we accept the court's factual findings, we nonetheless hold that it erred by determin­ing that Wisegarver's actions and omissions did not violate the Act.

Section 2 of the Act provides as follows:

"Unfair methods of competition and un­fair or deceptive acts or practices, includ­ing but not limited to the use or employment of any decep­tion, fraud, false pretense, false prom­ise, mis­represen­tation or the con­cealment, suppression[,] or omission of any material fact, with intent that others rely upon the concealment, suppres­sion[,] or omis­sion of such material fact, or the use or employ­ment of any practice described in [s]ection 2 of the 'Uniform Deceptive Trade Prac­tices Act', *** are hereby declared un­lawful wheth­er any person has in fact been misled, de­ceived[,] or dam­aged there­by."  815 ILCS 505/2 (West 1992).

Section 2 of the Uniform Deceptive Trade Practices Act (Uniform Act) provides, in relevant part, as follows:

"A person engages in a deceptive trade practice when, in the course of his business, vocation[,] or occupation, he:

* * *

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."  815 ILCS 510/2(12) (West 1992). 

Thus, to state a claim under section 2 of the Act, a plain­tiff must allege and prove that (1) the defendant performed a decep­tive act or prac­tice, including conceal­ment or omission of any materi­al fact; (2) the defendant intended that the plain­tiff rely on the deception; and (3) the deception occurred in the course of conduct involving trade and commerce.  
Connick v. Suzuki Motor Co.
, 174 Ill. 2d 482, 501, 675 N.E.2d 584, 593 (1996).  A materi­al fact exists where the plaintiff would have acted differently had she been aware of it, or if it concerned the type of informa­tion upon which she would be expected to rely in making her decision to act.  
Connick
, 174 Ill. 2d at 505, 675 N.E.2d at 595.  In addition, courts should liber­al­ly construe and broadly apply the Act to eradi­cate all forms of deceptive and unfair business practices.  
Randels v. Best Real Estate, Inc.
, 243 Ill. App. 3d 801, 805, 612 N.E.2d 984, 987 (1993).           

In its June 1997 order, the trial court wrote the following:

"Although the Act clearly applies to [Wisegarver], the [c]ourt does not find that the plaintiff has proven, by a preponderance of the evidence, any deception, fraud, false pretense, false promise, misrepresentation[,] or the con­ceal­ment, suppression[,] or omis­sion of any mate­rial fact within the meaning of the Act.

The [c]ourt, however, does have concerns about [Wisegarver's] actions vis a vis the plain­tiff from a fiduciary standpoint during the peri­od, at the least, from January 7, 1993[,] to February 8, 1993[,] and, possibly, until when the sales contract was actually signed on April 14, 1993.  The court's con­cerns, however, are techni­cal in nature and relate solely to the high du­ties imposed legally upon a fiduciary in this situation.  The [c]ourt does not believe that its find­ings on this count are inconsistent with the jury's finding on [c]ount I.  The jury could have found that the breach of fiduciary duty did not stem from any deception, fraud[,] or misrepresen­tation, but simply from technical, albeit inten­tional, breaches of the duty.  For instance, the issues instruction indi­cates that the fiduciary relationship could have been breached by failure to give written notice that he was acting on his own behalf (i), by failing to use his best ef­forts to procure the best and highest selling price (h), by failing to remain loyal to the inter­est of the plaintiffs when he failed to list the property for sale (e), and by placing his own interests ahead of the plaintiffs (d) ***.  The jury was also informed of a statute that required that a person holding a real estate license can­not act for more than one party without providing written notice ***.  Indeed, the only allegation of breach of fiduciary relationship by a material misrep­resentation in the issues instruc­tion was subparagraph (a) [namely, Wisegarver misrep­re­sented to plain­tiffs that it was not eco­nomically feasible to subdivide the land]."

Reading the trial court's comments in context, it appears that--con­trary to plaintiffs' assertion--the court was aware that concealment, suppression, or omission of information could support a violation of the Act.  The court, in discussing "tech­ni­cal" breaches, was instead referring to whether Wisegarver's actions or omissions involved 
materi­al
 facts, not whether Wisegarver had con­cealed, sup­pressed, or omitted facts.  More­over, it appears that the court accepted most of the jury's findings of fact.  In particular, the court noted that the jury could have found that Wisegarver's breach of his fiduciary duty stemmed from "techni­cal, albeit intentional breach­es," such as (1) Wisegarver's failure to give written notice that he was acting on his own behalf to develop the property as a subdivi­sion; (2) his failure to use his best efforts to procure the best and highest selling price for the property on plaintiffs' behalf; (3) his failure "to remain loyal to the interest of the plain­tiffs when he failed to list the property for sale"; (4) Wisegarver's placing his own interests ahead of plain­tiffs' interests when he pro­ceeded to subdivide the land and sell the parcels for a substan­tially higher aggregate price than he paid for the land; and (5) his failure to provide written notice that he was acting for more than one party.  Although the court apparent­ly accepted those factual findings, it nonetheless determined that those acts and omissions by Wisegarver did not come within the scope of the Act.   

Generally, a reviewing court will not reverse a trial court's decision in a bench trial regarding whether the plaintiff has proved the ele­ments under the Act unless that decision is against the manifest weight of the evidence.  This is so because whether the plaintiff has proved those ele­ments usually consti­tutes a ques­tion of fact.  
Malooley v. Alice
, 251 Ill. App. 3d 51, 55, 621 N.E.2d 265, 268 (1993).  In review­ing the trial court's decision in this case, howev­er, we accept its factual determina­tions.  Thus, because only the trial court's legal conclu­sions are at issue, we review those conclu­sions 
de
 
novo
.  See 
In re D.G.
, 144 Ill. 2d 404, 408-09, 581 N.E.2d 648, 649 (1991) ("where neither the facts nor credibility of the witnesses is contested, the issue *** is a legal question which a reviewing court may consid­er 
de
 
novo
").  

Although we accept the trial court's factual determina­tions, we disagree with its application of the Act to those deter­mi­na­tions.  In particular, we note that Wisegarver's failure to provide plaintiffs with written notice that he was not acting solely for plaintiffs but was instead acting on his own behalf to develop the property as a subdivision constituted a violation of the Act.  Clearly, this is the type of information upon which plaintiffs would be expected to rely in making a decision to act and had Kirkruff known that fact, she testified that she would have acted differ­ently--namely, she would not have sold Wisegarver the property.  Nor can there be any serious conten­tion that Wisegarver did not intend for plain­tiffs to rely upon such an omission on his part.  See 
Seligman v. First Nation­al Invest­ments, Inc.
, 184 Ill. App. 3d 1053, 1064, 540 N.E.2d 1057, 1064 (1989) (where the court held that the failure of real estate brokers to dis­close such self-dealing constituted consumer fraud under the Act).  Moreover, we note that Wisegarver's actions and omissions constituted deceptive acts and omissions under section 2(12) of the Uniform Act (815 ILCS 510/2 (West 1992)).  In particular, the following acts by Wisegarver constituted conduct which created "a likeli­hood of confu­sion or of misunderstanding" on Kirkruff's part regarding the property's develop­ment potential and value:  (1) his failure to provide written notice that he was acting on his own behalf; (2) his failure to list the property for sale as he had agreed to do; (3) his failure to use his best efforts to procure the best and highest selling price for the property on the plaintiffs' behalf; and (4) his placing his own interests ahead of plaintiffs' interests by proceeding to subdi­vide the land and sell the parcels.  Thus, because we con­clude that Wise- garver's acts and omissions--which the trial court accepted as proven--consti­tuted viola­tions of the Act, we hold that the trial court's deci­sion to the contrary was errone­ous.  

III.  CONCLUSION

In closing, we commend the trial court for its thought­ful memorandum, which we found very helpful.

For the reasons stated, we affirm the trial court's judgment in part, reverse in part, and remand for further pro­ceedings.

Affirmed in part; reversed in part; remanded for further proceedings.

GARMAN, P.J., and McCULLOUGH, J., concur.